Filed 1/4/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| MARCUS VAUGHN et al.,<br><br>        Plaintiffs and Respondents,<br>v.<br><br>TESLA, INC.,<br><br>        Defendant and Appellant. | A164053<br><br>(Alameda County<br>Super. Ct. No. RG17882082) |

Defendant and appellant Tesla, Inc. (Defendant) appeals from the denial of its motion to compel arbitration of workplace race discrimination claims asserted by plaintiffs Monica Chatman and Evie Hall (Plaintiffs). Plaintiffs initially worked for Defendant through staffing agencies before signing employment letters prepared by Defendant in July 2017. Plaintiffs' complaint alleged the discrimination occurred before and after the letters were signed. We determine the trial court properly relied on the language in an arbitration provision contained in the letters to exclude from arbitration those claims based on conduct occurring during periods Plaintiffs were employed by staffing agencies rather than directly by Defendant. We also conclude the trial court properly declined to mandate arbitration of Plaintiffs' request for a public injunction. On that issue, we reject Defendant's two principal contentions. First, we hold that injunctions sought under the Fair Employment and Housing Act (FEHA) (Gov. Code, §§ 12900 et seq.) may be considered "public injunctions." Second, we rule the Federal Arbitration Act

1

(FAA) (9 U.S.C. § 1 et seq.), as interpreted in *Viking River Cruises, Inc. v. Moriana* (2022) ___ U.S. ___ [142 S.Ct. 1906, 213 L.Ed.2d 179] (*Viking River*), does not preempt the California rule prohibiting waiver of the right to seek such injunctions.

BACKGROUND

Defendant, a manufacturer of electric vehicles, operates a factory in Fremont, California. Through staffing agencies, plaintiff Chatman began working at Defendant's Fremont factory in November 2016 and plaintiff Hall began working there in March 2017. In July 2017 letters, Defendant offered Hall and Chatman employment at specified wages and with specified benefits. The letters stated, "If you accept our offer, your first day of employment will be August 2, 2017."[1]

Plaintiffs each electronically signed their offer letters.[2] Those offer letters contain the following arbitration agreement (Arbitration Provision): "[T]o ensure the rapid and economical resolution of disputes that may arise in connection with your employment with Tesla, you and Tesla agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to your employment, or the termination of your employment, will be resolved, to the fullest extent permitted by law by final, binding and confidential arbitration . . ." (Italics and bolding omitted.)

In November 2017, plaintiff Marcus Vaughn filed a complaint alleging he suffered a racially hostile work environment at Defendant's Fremont factory. He alleged that he and other Black workers had "suffered severe and

---

[1] Chatman and Hall seek to represent a subclass of workers who worked for staffing agencies for a portion of the time they worked at Defendant's factory. The claims of other named plaintiffs are not at issue on appeal.

[2] Defendant terminated Chatman's employment in September 2019.

pervasive harassment." Vaughn alleged three causes of action under FEHA. Although Defendant offered Vaughn direct employment, he never signed the offer letter, which contained an arbitration agreement. For that reason, the trial court denied Defendant's motion to compel arbitration of Vaughn's claims, and this Court affirmed in *Vaughn v. Tesla, Inc.* (May 21, 2019, A154753) [nonpub. opn.].

In November 2020, Defendant moved to deny class certification and to strike the class allegations in plaintiff Vaughn's complaint, arguing among other things that, because Vaughn was not bound to arbitrate, he could not adequately represent the interests of workers who had agreed to arbitration. The trial court directed Vaughn to file an amended complaint "that asserts subclasses." In May 2021, plaintiff Vaughn filed a first amended complaint with proposed subclasses. On the same day, Vaughn moved for leave to file a second amended complaint adding Chatman and Titus McCaleb as named plaintiffs. In June 2021, Vaughn sought leave to add Hall as a named plaintiff. The trial court granted leave to amend. Plaintiffs filed their Second Amended Complaint (Complaint) in July.[3]

Among other allegations, the Complaint alleges that Plaintiffs and other similarly situated Black co-workers were subjected to repeated instances of racial harassment and discrimination, including regularly being called racial slurs by co-workers and supervisors. Plaintiffs seek to represent a class of Black persons who worked in Defendant's factory at various times after November 2016. The Complaint asserts causes of action for "Race-Based Discrimination in Violation of FEHA," "Race-Based Harassment in

---

[3] The Complaint alleges that Titus McCaleb never signed an arbitration agreement or became a direct employee of Defendant. He was not named in the motion to compel arbitration at issue in the present appeal, and he is not a party to it.

Violation of FEHA," and "Failure to Prevent Race-Based Discrimination and Harassment in Violation of FEHA." Plaintiffs are alleged to be part of a subclass of workers who were employed for portions of time by staffing agencies and subsequently became direct employees of Defendant. Plaintiffs seek relief against Defendant based on a "joint" or "dual" employer theory for periods they were employed by staffing agencies.[4]

In August 2021, Defendant moved to compel arbitration of Plaintiffs' claims. Defendant pointed out that "[n]one of Chatman and Hall's allegations distinguish between the time they were employed by staffing companies and the time they were directly employed by Tesla" and argued, among other things, that the Arbitration Provision mandated arbitration because all of the claims "related to" Plaintiffs' employment with Defendant. Defendant also argued Plaintiffs could not seek a "public injunction" under FEHA. In opposition, Plaintiffs argued, among other things, that they were *not* obligated to arbitrate claims based on conduct before August 2, 2017, which was the date the offer letter identified as the "first day of employment." Plaintiffs also argued they had the right to seek a public injunction in court because the Arbitration Provision prohibited such an award in arbitration.

---

[4] "In the context of an individual who is employed by a temporary agency and assigned to work on the premises of the agency's client, . . . both the agency and the client are employers" if "the client company had the right to exercise certain powers of control over the employee," and "an employee injured by violations of FEHA" may "look to both employers for redress." (*Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1183–1184; see also *Jimenez v. U.S. Cont'l Mktg., Inc.* (2019) 41 Cal.App.5th 189, 197–98 ["This general principle—that an individual may be held to have more than one employer in the temporary-staffing context—has 'long been recognized . . . for purposes of applying state and federal antidiscrimination laws.' "].)

Following a hearing, the trial court granted Defendant's petition to compel arbitration in part and denied it in part. Regarding the scope of the Arbitration Provision, the court concluded, "Applying the plain language of the contracts, the arbitration clauses require [Plaintiffs] to arbitrate disputes that arise on or after 8/2/17." The court also concluded, "any claims based on alleged wrongs before [8/2/17] are not within the temporal scope of the agreements." The trial court also denied the motion to compel arbitration to the extent that Plaintiffs sought a public injunction.

The present appeal followed, and the trial court stayed any portion of the case that was not automatically stayed by the filing of the notice of appeal.

## DISCUSSION

I.  *Legal Background and Standard of Review*

"Both the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) and the FAA . . . recognize ' " 'arbitration as a speedy and relatively inexpensive means of dispute resolution' " and are intended " 'to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' " [Citation.]' [Citations.] The fundamental policy underlying both acts 'is to ensure that arbitration agreements will be enforced *in accordance with their terms.*' " (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59.)

The FAA mandates that "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." (*Lamps Plus, Inc. v. Varela* (2019) __U.S.__ [139 S.Ct. 1407, 1418, 203 L.Ed.2d 636] (*Lamps*

*Plus*).)[5]  Nevertheless, " '[t]here is no public policy . . . that favors the arbitration of disputes the parties did not agree to arbitrate.' " (*Howard, supra*, 30 Cal.App.5th at p. 663.)  That is because "it is a cardinal principle that arbitration . . . 'is a matter of consent, not coercion,' " and " ' "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." ' " (*Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle Museum*).)  Thus, the policy favoring arbitration " 'does not override ordinary principles of contract interpretation' . . . '[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested.' " (*Ahern v. Asset Mgmt. Consultants, Inc.* (2022) 74 Cal.App.5th 675, 688.)

"Although the FAA preempts any state law that stands as an obstacle to its objective of enforcing arbitration agreements according to their terms, . . . we apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute." (*Avery, supra*, 218 Cal.App.4th at pp. 59–60.)  "General contract law principles include that '[t]he basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting.  [Citations.] ... "The words of a

---

[5] Some appellate decisions have suggested this rule is also required by California's "strong public policy in favor of arbitration." (*Howard v. Goldbloom* (2018) 30 Cal.App.5th 659, 663 (*Howard*); see also *Victrola 89, LLC v. Jaman Properties 8 LLC* (2020) 46 Cal.App.5th 337, 355–356.)  But in *Sandquist v. Lebo Auto., Inc.* (2016) 1 Cal.5th 233, the California Supreme Court held as a matter of state law that, where, as here, interpretation of an arbitration agreement drafted by the employer is involved, "it is a 'well established rule of construction' that any ambiguities must be construed against the drafting employer and in favor of the nondrafting employee." (*Id.* at p. 248.)  However, *Lamps Plus, supra*, 139 S.Ct. 1407, requires a different rule that we follow.

6

contract are to be understood in their ordinary and popular sense." '
[Citation.]  Furthermore, ' "[t]he whole of a contract is to be taken together,
so as to give effect to every part, if reasonably practicable, each clause
helping to interpret the other." (Civ. Code, § 1641.)' " (*Franco v. Greystone
Ridge Condo.* (2019) 39 Cal.App.5th 221, 227 (*Franco*).)

"Where, as here, the evidence is not in conflict, we review the trial
court's denial of arbitration de novo." (*Pinnacle Museum*, *supra*, 55 Cal.4th
at p. 236.)

II.  *The Arbitration Provision Only Encompasses Claims Based on Conduct
Following the Commencement of Direct, Contractual Employment*

Defendant contends the trial court erred in concluding the Arbitration
Provision does not apply to claims based on conduct preceding the
commencement of direct, contractual employment on August 2, 2017.  The
court did not err.

A.  *Defendant's Interpretation is Contrary to the Plain Language of
the Arbitration Provision*

As noted previously, the Arbitration Provision states, "[T]o ensure the
rapid and economical resolution of disputes that may arise in connection with
your employment with Tesla, you and Tesla agree that any and all disputes,
claims, or causes of action, in law or equity, arising from or relating to your
employment, or the termination of your employment, will be resolved, to the
fullest extent permitted by law by final, binding and confidential
arbitration . . ."  (Emphasis omitted.)  Defendant's offer letters clarify the
term "employment," stating, "If you accept our offer, your first day of
employment will be August 2, 2017."  Thus, it is clear that "employment" as
used throughout the Arbitration Provision and specifically in the phrase
"arising from or relating to your employment" refers to the period of direct,

contractual employment, not prior periods during which Plaintiffs were employed by staffing agencies and assigned to work at Defendant's factory.[6] Under that construction of the Arbitration Provision, the parties agreed to arbitrate claims arising from or relating to Plaintiffs' direct employment with Defendant, not pre-contract claims.[7]

Although Defendant does not expressly concede the point, it presents no argument disputing that "employment" in the Arbitration Provision must be construed to refer to the period of direct employment. Instead, the main thrust of Defendant's argument is that Plaintiffs' "hostile work environment claims, even if based solely on conduct occurring before August 2, 2017, *related* to their employment with Tesla."

Defendant is correct that the use of the phrase "arising from or relating to" signifies the Arbitration Provision is a "broad provision." (*Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 659 (*Khalatian*).) However, the phrase only acquires meaning by considering what two things are being related to each other—in this instance Plaintiffs' claims and their

---

[6] As Plaintiffs point out, Defendant's offer letters "repeatedly use[] the word 'employment' or 'employee' in the exclusive sense of referring only to Plaintiffs' *future* working relationship with" Defendant—for example, in reference to the applicability of policies and entitlement to benefits. (*See Hom v. Petrou* (2021) 67 Cal.App.5th 459, 473 ["[A] word used multiple times in a contract is generally given the same meaning, unless the contract indicates otherwise."].)

[7] Defendant observes that Plaintiffs, "based on a 'joint employer' theory . . . allege Tesla *was their employer* before *and* after they signed" the offer letters containing the Arbitration Provision. But Defendant fails to explain why application of the joint employer doctrine would affect the construction of "employment" in the Arbitration Provision. (See *Jimenez v. U.S. Cont'l Mktg., Inc.*, *supra*, 41 Cal.App.5th at p. 199 [describing "the issue presented" as whether the defendant was the plaintiff's "employer *for the purposes of FEHA*"] (Italics added.).)

*direct* employment with Tesla. (*Ramos v. Superior Ct.* (2018) 28 Cal.App.5th 1042, 1051 (*Ramos*) ["While the phrase 'arising under or related to' is very broad, it is necessarily qualified by what follows."].)

It is well established—including in the very cases Defendant principally relies upon—that when courts say that an arbitration agreement including "relating to" is broad, it typically is because it expands the reach of the agreement to encompass claims rooted in the employment relationship, even if the claims do not actually arise from the employment contract itself. As explained in *Rice v. Downs* (2016) 248 Cal.App.4th 175, at page 186, " 'It has long been the rule in California that a broadly worded arbitration clause . . . may extend to tort claims that may arise under or from the contractual relationship. "There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that *the dispute* must arise out of contract." ' " (See also *Khalatian*, *supra*, 237 Cal.App.4th at p. 660 [broad provisions "are consistently interpreted as applying to extracontractual disputes between the contracting parties"].)

Consistent with the proposition that "relating to" acquires meaning from the subjects being related, the phrase normally encompasses extracontractual claims only "so long as they have their roots in the relationship between the parties which was created by the contract." (*Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1003; accord, *Khalatian*, *supra*, 237 Cal.App.4th at p. 660; *Howard*, *supra*, 30 Cal.App.5th at p. 664; *Ramos*, *supra*, 28 Cal.App.5th at p. 1052.) For example, *Khalatian* held that Labor Code claims were encompassed by the arbitration agreement in that case, even though the plaintiff did not rely on the compensation provisions in his employment contract (*Khalatian*, at p. 660); *Ramos* held that statutory employment claims were within the scope of an arbitration

9

agreement because the underlying contract was relevant to the claims in several respects (*Ramos*, at p. 1053); and *Howard* held that a claim the defendant wrongfully diluted the value of the plaintiff's shares in the company was *not* rooted in the contractual employment relationship (*Howard*, at p. 670).

Thus, Defendant is mistaken in suggesting the Arbitration Provision must be applied to pre-contract disputes in order to give meaning to the inclusion of the words "relating to" in addition to "arising from." As noted, the inclusion of "relating to" typically justifies applying arbitration agreements to claims that do not arise from the contract. In contrast, "narrow clauses" stating only "arising from" " 'have generally been interpreted to apply only to disputes regarding the interpretation and performance of the agreement.' " (*Howard*, *supra*, 30 Cal.App.5th at p. 664.) Thus, while courts have given significance to the inclusion of the more expansive "relating to" language, Defendant cites no authority that relies on the language to require arbitration of a pre-contract claim—i.e., arbitration of a claim *not* rooted in the employment relationship established by the contract containing an arbitration provision.

Defendant relies on an unpublished federal district court decision in which the court found an arbitration agreement applied to an action based on employees' alleged deletion of material from their computers upon their termination. (*Whole Body Research, LLC v. Digest MD, LLC* (C.D. Cal. July 3, 2018, No. LA CV18-01233 JAK (JCx)) 2018 U.S.Dist. Lexis 217107, pp. 8–9.) In that case, the court concluded the arbitration agreement encompassed the "post-employment activity" because the former employees were able to access the computers due to their employment. (*Id.* at p. 9.) By contrast, in the present case, Plaintiffs' contractual "employment" did not even commence

until *after* the conduct upon which the claims at issue are based. While it was sensible for the *Whole Body Research* court to conclude the claims there were "rooted in" the employees' employment, the same cannot be said in the present case, given how the offer letters define "employment."

Defendant also points out that Plaintiffs "worked at the same Tesla factory, in the same role, with the same coworkers, for the same supervisors, under the same management" before August 2, 2017, and that Plaintiffs "allege [Defendant] Tesla engaged in the same unlawful conduct before and after they signed the arbitration agreement." But the question in interpreting the Arbitration Provision is not whether Plaintiffs' pre- and post-August claims are factually similar or share evidence in common, but whether Plaintiffs' claims based on conduct that did *not* occur during Plaintiffs' direct, contractual "employment" "relate to" the period of "employment" that followed the contracts. Here, the "alleged wrongs" during the period of staffing agency employment "exist independently of" the subsequent "employment relationship" with Defendant. (*Howard*, *supra*, 30 Cal.App.5th at p. 670.) Defendant cites no authority that factual commonalities are sufficient to justify extension of an arbitration agreement to pre-contractual employment claims absent any indication the parties understood the agreement would apply in that manner.

In summary, Defendant fails to persuade that the "relating to" phrase means the Arbitration Provision applies to any past dispute between the parties, based on events occurring before commencement of the contractual "employment" relationship. Defendant's proposed construction of "relating to" lacks support in the caselaw and would expand the application of the Arbitration Provision well beyond the reasonable expectations of the parties. (See *Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 788 [" 'An

11

essential element of any contract is the consent of the parties, or mutual assent.' . . . 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts . . . .' "].)  Because Plaintiffs' claims based on pre-August 2017 conduct are not "root[ed] in the relationship between the parties which was created by the contract"—*because that relationship did not yet exist*—the inclusion of the language "relating to" does not justify applying the Arbitration Provision to those claims.  (*Khalatian*, *supra*, 237 Cal.App.4th at p. 660; *Howard, supra,* 30 Cal.App.5th at p. 664.)

Finally, our conclusion finds support in the provision's express statement of purpose: "[T]o ensure the rapid and economical resolution of disputes that *may arise* in connection with your employment with Tesla …" (Emphasis added.)  That forward-looking language suggests the intent of the Arbitration Provision is to address claims based on incidents occurring during the period of direct employment.  "The use of the present-tense 'arise,' rather than the past-tense 'arose' or present-perfect 'have arisen,' suggests that the contract governs only disputes that begin—that arise—in the present or future.  The present tense usually does not refer to the past." (*Russell v. Citigroup, Inc.* (6th Cir. 2014) 748 F.3d 677, 679.)  Furthermore, "the auxiliary verb 'may' signals a hazard that is yet to come rather than an incident that has come to pass."  (*Id.* at p. 680; see also *Salgado v. Carrows Restaurants, Inc.* (2019) 33 Cal.App.5th 356, 360–361 (*Salgado*) [implicitly acknowledging that " 'disputes which may arise' " is forward-looking language].)  Although not determinative, we conclude the reference to "may arise" in the Arbitration Provision's statement of purpose is further support for our rejection of Defendant's interpretation.

B.	*The* Salgado *and* Franco *Decisions Do Not Support Defendant's Interpretation of the Arbitration Provision*

The parties each argue that their position is supported by the decisions in *Salgado v. Carrows Restaurants, Inc.*, *supra*, 33 Cal.App.5th 356 and *Franco v. Greystone Ridge Condo.*, *supra*, 39 Cal.App.5th 221. Those cases are readily distinguishable.

In *Salgado*, *supra*, 33 Cal.App.5th 356, the plaintiff had been a direct employee at the defendant restaurant for decades, before filing a lawsuit alleging claims for employment discrimination and violation of civil rights. (*Id.* at p. 358.) The following month, she signed an arbitration agreement, which contained two relevant provisions. (*Id.* at p. 359.) The first provided, " 'The Company and I agree and acknowledge that we will utilize binding arbitration as the sole and exclusive means to resolve all disputes which may arise out of or be related in any way to my application for employment and/or employment, including but not limited to the termination of my employment and my compensation.' " (*Ibid.*) The second provided in relevant part, " 'Both the Company and I agree that any claim, dispute, and/or controversy that I may have against the Company . . . or the Company may have against me, shall be submitted to and determined exclusively by binding arbitration.' " (*Ibid.*)

The *Salgado* court rejected the plaintiff's contention the arbitration agreement was not retroactive. As to the first provision, the court acknowledged the " 'may arise' " language suggested application to future claims, but concluded the use of " 'or' " meant that " 'all disputes' related 'in any way' to employment" were also encompassed by the provision. (*Salgado*, *supra*, 33 Cal.App.5th at pp. 360–361.) As to the second provision, the court observed that it "unequivocally requires arbitration for 'any claim' [the

13

plaintiff] has against [the defendant]." (*Id.* at p. 361; see also *Desert Outdoor Advert. v. Superior Ct.* (2011) 196 Cal.App.4th 866, 877 [language " 'any . . . dispute of any kind whatsoever between us' " contains "no temporal limitation"].)

In *Franco, supra*, 39 Cal.App.5th 221, direct employees of the defendant company were asked to sign an arbitration agreement encompassing " '[a]ny and all claims . . . relating to any aspect of . . . employment with Employer (pre-hire through post-termination).' " (*Id.* at p. 223.) The plaintiff, who had been employed by the defendant company for years, signed the arbitration agreement days after filing an action alleging FEHA and other claims. (*Id.* at pp. 223–225.) The plaintiff opposed the defendant's petition for arbitration on the ground that the agreement "failed to expressly state that claims that had already accrued, including the claims asserted in plaintiff's complaint, were subject to arbitration." (*Ibid.*) The court of appeal concluded the arbitration agreement encompassed the plaintiff's claims because it was not limited to claims that had yet to accrue and "the agreement's reference to claims relating to 'pre-hire' matters expresses an intent to cover all claims, regardless of when they accrued, that are not otherwise expressly excluded by the arbitration agreement." (*Ibid.*; see also *id.* at p. 230.)

Clear differences exist between the Arbitration Provision and the comparable clauses in *Salgado* and *Franco*. Most significantly, the plain language of the Arbitration Provision does not encompass Plaintiffs' claims because their direct "employment" with Defendant, as that term is used in the provision, did not begin until August 2017. In contrast, the plaintiffs in *Salgado* and *Franco* were direct employees long before execution of the arbitration agreements, so there is no question their claims were rooted in

that employment, even though the claims accrued before the arbitration agreements were signed.  Given the ongoing employment relationship, the key question in those cases was whether the arbitration agreements were properly " 'applied retroactively to transactions which occurred prior to execution of the arbitration agreement.' " (*Salgado, supra,* 33 Cal.App.5th at p. 361.)  That is *not* the issue in the present case.  Instead, the issue is whether the Arbitration Provision is properly applied to transactions that occurred prior to the existence of the contractual employment relationship, a fundamentally different matter.[8]

Further, both *Salgado* and *Franco* involved language from which the courts could infer an intent to apply the agreement to *all* claims between the parties.  In *Salgado*, the plaintiff agreed to arbitrate " 'any claim' " she had

---

[8] An unpublished Fourth Circuit decision cited by Plaintiffs makes the same point.  In *Newbanks v. Cellular Sales of Knoxville, Inc.* (4th Cir. 2013) 548 Fed. Appx. 851, the plaintiffs worked as independent contractors for the defendant and subsequently entered into employment contracts.  (*Id.* at p. 852.)  The contracts required arbitration of " '[a]ll claims, disputes, or controversies arising out of, or in relation to this document or Employee's employment with [the] Company.' " (*Ibid.*)  The Fourth Circuit concluded the arbitration provision did not apply to disputes based on conduct prior to execution of the contracts.  (*Id.* at p. 857.)  Among other things, the court observed that, "prior to the execution of the" contracts, "there existed no employment relationship between [the parties].  We will not read the arbitration agreements to apply to a relationship, a contractual status, that simply did not exist." (*Id.* at p. 856.)  The same reasoning applies in the present case.

The parties also cite a number of other federal district court and circuit court decisions, mostly unpublished.  None of those cases demonstrate the trial court erred, and discussion of them is unnecessary to resolution of the present appeal.

against the defendant (*Salgado*, *supra*, 33 Cal.App.5th at p. 361),[9] and in *Franco*, the agreement expressly referred to " 'pre-hire' " claims (*Franco*, *supra*, 39 Cal.App.5th at pp. 224, 230, 232). The Arbitration Provision in the current case contains no comparable language; instead, it references only the period of direct employment and makes a forward-looking reference to "disputes that may arise." It encompasses only claims related to the period of direct, contractual employment, not *any* dispute between the parties.

The differences between the *Franco* and *Salgado* cases and the present case undermine Defendant's argument that they support the conclusion that the Arbitration Provision applies to pre-contract disputes.

C.    *Defendant Has Not Shown the Trial Court Erred in Temporally Dividing Plaintiffs' Claims*

Finally, Defendant argues the trial court erred in temporally dividing Plaintiffs' claims, sending to arbitration only those based on conduct during the period of direct, contractual employment. Defendant observes Plaintiffs "asserted claims covering the entire time they worked at Tesla . . . . They did not assert separate, sequential hostile work environment claims partitioned by time period and based on alleged conduct occurring before and after August 2, 2017." But it is Defendant who obligated the trial court to temporally divide Plaintiffs' claims by moving for arbitration. Defendant cites no authority the trial court was required in these circumstances to send

---

[9] Although it appears the *Salgado* court concluded the " 'related in any way' " language in the first provision was itself sufficient to require arbitration (*Salgado*, *supra*, 33 Cal.App.5th at pp. 360–361), the broad language in the second provision supported a broad interpretation of the first provision. (See *Garcia v. Expert Staffing West* (2021) 73 Cal.App.5th 408, 414 [same court in subsequent decision emphasizing language in second provision in explaining *Salgado* holding].)

16

to arbitration Plaintiffs' claims based on conduct outside the scope of the Arbitration Provision.

In support of its argument, Defendant cites cases in which courts of appeal concluded it was improper for trial courts to split a plaintiff's Labor Code Private Attorney General Act of 2004 (PAGA) (Lab. Code, §§ 2698– 2699.8) claim into an individual wage claim and a claim for civil penalties. (*Mejia v. Merchs. Bldg. Maint., LLC* (2019) 38 Cal.App.5th 723, 727–728, disapproved on other grounds by *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 196, fn. 8; *Zakaryan v. The Men's Wearhouse, Inc.* (2019) 33 Cal.App.5th 659, 676, disapproved on other grounds by *ZB,* at p. 196, fn. 8.) Those courts reasoned that splitting the claim in that way was contrary to the public policy reflected in PAGA (*Zakaryan*, at p. 676) and "effectively usurps the plaintiff's choice to pursue a PAGA action, alone" (*Mejia*, at p. 743). Nothing in those decisions suggests a trial court may force a party to arbitrate a claim it did not agree to arbitrate.[10]

Defendant does not dispute Plaintiffs allege they were subject to discrimination during the periods they worked at Defendant's factory on assignment by staffing agencies, or that the allegations are sufficient to state hostile work environment claims based solely on conduct during those same periods. Under California law, "If a plaintiff's . . . cause of action includes both arbitrable and inarbitrable claims, . . . the trial court must sever the cause of action, order the arbitrable portion to arbitration, and stay the inarbitrable portion pending the completion of arbitration." (*Clifford v. Quest Software Inc.* (2019) 38 Cal.App.5th 745, 750.)

---

[10] We also note it appears the holdings in *Mejia* and *Zakaryan* have been overruled by *Viking River*, *supra*, 142 S.Ct. 190 (see Part III.B., *post*).

17

As the appellant, Defendant has the burden to show error, with "adequate argument including citations to supporting authorities." (*Yield Dynamics, Inc. v. TEA Sys. Corp.* (2007) 154 Cal.App.4th 547, 557.) Defendant has failed to cite any authority to this court supporting its contention that the trial court was without authority to temporally divide Plaintiffs' claims for adjudication in separate fora, sending to arbitration only those claims they agreed to arbitrate.

D.    *Conclusion*

The trial court did not err in granting Defendant's petition to compel arbitration only as to Plaintiffs' claims based on conduct occurring after August 2, 2017.[11]

III.    *The Trial Court Properly Refused to Enforce a Contractual Waiver of Plaintiffs' Right to Seek a Public Injunction Under FEHA*

Plaintiffs' Complaint seeks a "public injunction, enjoining Defendant[] from committing further violations of the FEHA with respect to race discrimination and harassment against Black and/or African-American workers, and failure to prevent such." The prayer for relief adds, "Such relief at minimum should include implementation of effective policies to prevent and correct race harassment, implementation of mandatory training regarding harassment for all of Defendant['s] managerial and non-managerial employees, and a public declaration that [Defendant's] widely-known racist practices contravene California law and will not continue and

---

[11] Defendant suggests there may be practical difficulties in adjudicating temporally distinct hostile work environment claims. But Defendant fails to explain how any such difficulty provides a basis to require Plaintiffs to arbitrate a claim they did not agree to arbitrate. Defendant also argues the trial court erred in its analysis in several other respects, but Defendant fails to explain how any of the purported errors are relevant given this court's de novo review.

18

will not be tolerated." The trial court denied Defendant's motion to compel as to Plaintiffs' request for a public injunction. On appeal, Defendant contends the trial court erred because FEHA "does not authorize plaintiffs to obtain 'public injunctions.' " Defendant also argues that, under the reasoning of the recent *Viking River* decision, the FAA preempts California's rule against contractual waivers of the right to seek a public injunction. We reject Defendant's contentions.

A.      *Plaintiffs May Seek a Public Injunction Under FEHA*

In *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945 (*McGill*), at page 955, the California Supreme Court discussed the distinction "between private injunctive relief—i.e., relief that primarily 'resolve[s] a private dispute' between the parties [citation] and 'rectif[ies] individual wrongs' [citation], and that benefits the public, if at all, only incidentally—and public injunctive relief—i.e., relief that 'by and large' benefits the general public [citation] and that benefits the plaintiff, 'if at all,' only 'incidental[ly]' and/or as 'a member of the general public.' " *McGill* discussed the court's prior decisions establishing that "public injunctive relief under the [Unfair Competition Law (UCL)], the [Consumer Legal Remedies Act (CLRA)], and the false advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." (*McGill*, at p. 955, citing *Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303 (*Cruz*) and *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 (*Broughton*).) In *McGill*, the court concluded that an arbitration agreement waiving a statutory right to seek a public injunction "in any forum" is invalid as "contrary to California public policy" because it "would seriously compromise the public purposes the statute[ was] intended to serve." (*Id.* at pp. 952, 961.) The court further held that the FAA "does not

preempt this rule of California law or require enforcement of the waiver provision." (*Ibid.*)[12]  In the present case, the trial court extended *McGill's* analysis to FEHA, after concluding FEHA "serves a public purpose."

The Arbitration Provision in the present case provides that "Any claim, dispute, or cause of action must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding."  It also provides that "The arbitrator shall not have the authority to . . . award relief to a group or class of employees in one arbitration proceeding."  Plaintiffs argued in their brief on appeal that the Arbitration Provision "purports to prevent Plaintiffs from seeking a public injunction in any forum."  Defendant did not dispute that assertion in its reply brief.  Nevertheless, for the first time at oral argument, Defendant appeared to argue the provision does *not* prohibit issuance of a public injunction in arbitration because *McGill* stated that an action seeking such relief "does not constitute the 'pursu[it]' of 'representative claims or relief on behalf of others' " within the meaning of the ballot proposition at issue in that case. (*McGill*, *supra*, 2 Cal.5th at pp. 959–960.)  That argument has been forfeited. (*People v. Thompson* (2010) 49 Cal.4th 79, 110, fn. 13.)  In any event, the argument is misplaced.  Plaintiffs did not argue the Arbitration Provision prohibits public injunctive relief in arbitration under the provision's language prohibiting "representative" claims.  Instead, Plaintiffs highlighted the prohibition on "relief to a group or class of employees."  Defendant did not dispute at oral argument that a public injunction would constitute such prohibited relief. (See *Blair v. Rent-A-Ctr., Inc.* (9th Cir.

---

[12] In Part III.B., *post*, we address Defendant's contention that the *Viking River* decision requires us to conclude *McGill's* no-waiver rule is preempted.

20

2019) 928 F.3d 819, 831 [concluding that an analogous provision "precludes the arbitrator from awarding public injunctive relief"].) Accordingly, because the Arbitration Provision provides for resolution of all covered disputes in arbitration, but prohibits an arbitrator from granting non-individual relief, the provision does waive Plaintiffs' right to seek a public injunction "in any forum." (*McGill*, at p. 956, italics omitted; *Blair*, at p. 831.)

Turning to the validity of the Arbitration Provision, Defendant does not dispute that, under *McGill*, an arbitration agreement that precludes a plaintiff from pursuing public injunctive relief in any forum is invalid and unenforceable as a matter of state law (but see Part III.B., *post*). Instead, Defendant argues Plaintiffs' claims are not for public injunctive relief because under FEHA only an "aggrieved" person with an interest " ' " 'over and above the interest held in common with the public at large' " ' " has standing to file an action. (*Dep't of Fair Emp. & Hous. v. M&N Fin. Corp.* (2021) 69 Cal.App.5th 434, 443; see also Gov. Code, § 12965.) However, just because a member of the general public could not assert the FEHA claims in the Complaint does not mean that Plaintiffs cannot seek relief that has " 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." (*McGill*, *supra*, 2 Cal.5th at p. 955.) Indeed, *McGill* expressly rejected the argument Defendant makes on appeal. There, the court concluded that amendments to the UCL and false advertising law requiring that a plaintiff have " 'suffered injury in fact' " did *not* "preclude a private individual . . . [with] standing to file a private action—from requesting public injunctive relief in connection with that action." (*McGill*, at pp. 958–959.)

Defendant also argues the statutes at issue in *McGill*, *Broughton*, and *Cruz*—the false advertising law, the UCL, and the CLRA—are

21

distinguishable from FEHA.[13]  Defendant points out the false advertising law is "explicitly a statutory protection for the '*public* in this state' (Bus. & Prof. Code[,] § 17500, italics added.)"  It also cites *Broughton* for the proposition that the CLRA's purpose "is not to resolve a private dispute but to remedy a public wrong." (*Broughton*, *supra*, 21 Cal.4th at p. 1080.)  In contrast, Defendant argues, FEHA "protects individual employees or persons seeking employment, not the general public."[14]

Defendant does not dispute that injunctive relief is available in a FEHA action.  Although the false advertising law, the UCL, and the CLRA contain provisions expressly authorizing injunctions (*McGill*, *supra*, 2 Cal.5th at pp. 954–955), the California Supreme Court has held injunctive relief is also available under FEHA.  (*Aguilar v. Avis Rent A Car Sys., Inc.* (1999) 21 Cal.4th 121, 131–132; see also *id.* at p. 132 ["courts can, and often do, issue injunctions prohibiting the recurrence or continuation of employment discrimination"].)  As Defendant apparently recognizes, the determinative issue is whether the injunctive relief sought "has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public" (*McGill*, at p. 951; see also *Broughton, supra,* 21 Cal.4th at p. 1081; *Cruz, supra,* 30 Cal.4th at pp. 315–316), not whether the statutory authorization of injunctive relief is express or implied.

---

[13] Technically, this argument has been forfeited because Defendant made it for the first time in its reply brief.  (*Proctor v. Vishay Intertechnology, Inc.* (2013) 213 Cal.App.4th 1258, 1273–1274 (*Proctor*).)  However, because Plaintiffs anticipated the argument in their brief, we exercise our discretion to address it.  (*People v. Oneal* (2021) 64 Cal.App.5th 581.)

[14] That Plaintiffs seek a monetary recovery in addition to injunctive relief does not preclude a determination that they seek a public injunction. (*McGill, supra*, 2 Cal.5th at p. 957, fn. 1; see also *Cruz, supra*, 30 Cal.4th at p. 320; *Broughton, supra*, 21 Cal.4th at p. 1084.)

We reject Defendant's argument that requests for injunctive relief under the statues addressed in *McGill* may have " 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public" (*McGill, supra*, 2 Cal.5th at p. 955) but an injunction sought under FEHA may not. California Government Code section 12920 articulates the public purposes of FEHA in unambiguous language, stating, "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race [and other protected characteristics]. [¶] It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for these reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general."

Citing that provision, the California Supreme Court stated, in the context of a sex discrimination claim, "The public policy against sex discrimination and sexual harassment in employment . . . is plainly one that 'inures to the benefit of the public at large rather than to a particular employer or employee.' [Citation.] No extensive discussion is needed to establish the fundamental *public* interest in a workplace free from the pernicious influence of sexism. So long as it exists, we are *all* demeaned." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 90 (*Rojo*).) Similarly, in the context of an age discrimination claim, the Court stated, "there can be little doubt that the FEHA's express policy condemning employment discrimination against older workers is one that benefits the public at large. . . . [T]he pernicious effects of age discrimination in employment are not confined to the employees who are

23

its immediate targets. . . . [T]he practice of age discrimination, like other invidious forms of discrimination, 'foments domestic strife and unrest' in the workplace (Gov. Code, § 12920), making for a more stressful and ultimately less productive work environment." (*Stevenson v. Superior Ct.* (1997) 16 Cal.4th 880, 895 (*Stevenson*).)

The reasoning of those cases is fully applicable to discrimination on the basis of race. (*Carmichael v. Alfano Temp. Pers.* (1991) 233 Cal.App.3d 1126, 1132 [extending *Rojo* and stating, "In our view the public has a fundamental interest in a workplace free from the equally pernicious influence of racism. Racism, like sexism, demeans all of us."]; see also *Flannery v. Prentice* (2001) 26 Cal.4th 572, 584 [" '[t]he policy that promotes the right to seek and hold employment free of prejudice is fundamental' "]; *Armendariz v. Found. Health Psychcare Servs., Inc.* (2000) 24 Cal.4th 83, 100 ["There is no question that the statutory rights established by the FEHA are 'for a public reason.' "].)

Defendant fails to articulate any persuasive reason why injunctions sought under the false advertising law, the UCL, and the CLRA may be viewed as primarily benefitting the public but an injunction sought under FEHA may not.[15] Defendant asserts that a public injunction is available only as to acts "that are directed to the entire public," but it cites no authority supporting that view. Defendant's approach to the issue is inconsistent with

---

[15] Plaintiffs also point out that FEHA claims can be enforced through the UCL, which Defendant does not dispute provides for public injunctive relief. (See *Alch v. Superior Ct.* (2004) 122 Cal.App.4th 339, 401 ["age discrimination in violation of FEHA is an unlawful employment practice that may be enjoined under the UCL"].) Because we conclude Plaintiffs may seek a public injunction under FEHA, we need not address the relevance of the possibility that they could have sought a public injunction under the UCL based on the same underlying allegations.

that taken by the court of appeal in *Maldonado v. Fast Auto Loans, Inc.* (2021) 60 Cal.App.5th 710, which rejected a contention that "the *McGill* Rule . . . only applies to plaintiffs seeking to enjoin *false or misleading advertising* on behalf of the general public." (*Maldonado*, at p. 721.) The court emphasized that the CLRA was to be " ' "liberally construed" ' " to accomplish its purposes. (*Ibid.*) The court also rejected the proposition that an injunction would not benefit the public because only a small proportion of the public would be exposed to the defendant's unfair business practice, noting, "although 'not all members of the public will become customers of [the defendant]' this 'does not negate the fact that public injunctive relief will nevertheless offer benefits to the general public.' The requested injunction cannot be deemed private simply because [the defendant] could not possibly advertise to, or enter into agreements with, every person in California. . . . It is enough that the requested relief has the purpose and effect of protecting the public from [the defendant]'s ongoing harm." (*Id.* at p. 722; see also *Mejia v. DACM Inc.* (2020) 54 Cal.App.5th 691, 703–704; cf. *Clifford v. Quest Software Inc.*, *supra*, 38 Cal.App.5th at p. 753 ["The only express beneficiary of [the plaintiff]'s requested injunctive relief is [the plaintiff], and the only potential beneficiaries are [the defendant]'s current employees, not the public at large."]; *Capriole v. Uber Techs., Inc.* (9th Cir. 2021) 7 F.4th 854, 870 [request to " 'enjoin [the defendant] from misclassifying its drivers as independent contractors, thus entitling them to the protections of Massachusetts wage laws, including paid sick leave'—is overwhelmingly directed at [the P]laintiffs and other rideshare drivers"].)[16]

---

[16] A Ninth Circuit decision, *Hodges v. Comcast Cable Communs., LLC* (9th Cir. 2021) 21 F.4th 535, declined to follow *Maldonado* and *Mejia*. (*Hodges*, at pp. 544–545.) We are not bound by that decision (*People v. Uribe*

The same reasoning applies in the present case. Government Code section 12993, subdivision (a), states FEHA "shall be construed liberally for the accomplishment of the purposes of this part." (See also *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 819.) The Complaint alleges Defendant "was the fifth-most valuable company in America in 2021, and one of Alameda County's biggest employers." An injunction against further employment discrimination by Defendant would inure to the benefit of not only current Tesla employees, but to the benefit of their families and their communities, as well as to the benefit of future Tesla applicants and employees. Furthermore, as the California Supreme Court recognized in *Stevenson*, FEHA is premised on the Legislature's finding that invidious discrimination harms the public at large, including individuals lacking any direct connection to the workplace involved. (*Stevenson, supra,* 16 Cal.4th at p. 895.)

Because Plaintiffs' request for a public injunction "has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public" (*McGill, supra,* 2 Cal.5th at p. 955), the trial court properly denied Defendant's motion to compel arbitration as to that claim.[17]

---

(2011) 199 Cal.App.4th 836, 875), and we believe the analysis of the dissent is more consistent with *McGill* (*Hodges*, at pp. 549–554 (dis. opn. of Berzon, J.)). We also observe that Defendant makes no effort to defend the reasoning of the *Hodges* majority. Additionally, at issue in *Hodges* was a claim regarding a cable company's "privacy and data-collection practices." (*Id.* at p. 538.) The present case involves the prevention of discrimination, and the Legislature and the California Supreme Court have clearly stated that accomplishment of that goal is for the benefit of the public in general and not just the employees and applicants affected by the discrimination.

[17] Defendant argues for the first time in its reply brief that Plaintiffs really seek private relief, not a public injunction. The argument has been forfeited. (*Proctor, supra,* 213 Cal.App.4th at pp. 1273–1274.) In any event,

B. *The FAA Does Not Preempt California's No-Waiver Rule*

The FAA "stands as 'a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.'" (*Pinnacle Museum*, *supra*, 55 Cal.4th at p. 235; see also *Cronus Invs., Inc. v. Concierge Servs.* (2005) 35 Cal.4th 376, 384.) "To ensure that arbitration agreements are enforced according to their terms, 'the FAA pre-empts state laws which "require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."'" (*Pinnacle Museum*, at p. 235.)

In *McGill*, *supra*, 2 Cal.5th 945, the California Supreme Court concluded "that the FAA does not require enforcement of a provision in a predispute arbitration agreement that, in violation of generally applicable California contract law, waives the right to seek *in any forum* public injunctive relief under the UCL, the CLRA, or the false advertising law." (*McGill*, at p. 963.) The court reasoned, "The contract defense at issue here—'a law established for a public reason cannot be contravened by a private agreement' (Civ. Code, § 3513)—*is* a generally applicable contract defense, i.e., it is a ground under California law for revoking any contract. [Citation.] It is not a defense that applies only to arbitration or that derives its meaning from the fact that an agreement to arbitrate is at issue. . . . The FAA does not require enforcement of such a provision, in derogation of this generally applicable contract defense, merely because the provision has been inserted into an arbitration agreement." (*McGill*, at p. 962; see also *Morgan v. Sundance, Inc.* (2022) __U.S.__ [142 S.Ct. 1708, 1713, 212 L.Ed.2d 753] ["The

we have explained how the injunction sought by Plaintiffs would have the primary effect of benefitting the public rather than primarily the individual Plaintiffs or class members. (See *McGill*, *supra*, 2 Cal.5th at pp. 956-957 [explaining why relief sought in complaint was public injunctive relief].)

27

policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.' "].)  The *McGill* court further observed that its conclusion was "consistent with the high court's statement that, '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " (*McGill*, at p. 962, quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 628.)

Although *McGill* specifically addressed the UCL, the CLRA, and the false advertising law, Defendant does not suggest its reasoning is less than fully applicable to a claim for a public injunction under FEHA (though Defendant does dispute that such relief is available, as addressed in Part III.A., *ante*).  Instead, Defendant argues the United States Supreme Court's recent decision in *Viking River*, *supra*, 142 S.Ct. 1906, requires us to conclude *McGill's* no-waiver rule is preempted by the FAA.  We disagree.

### 1. *The* Viking River *Decision*

The *Viking River* decision, issued in June 2022, did not purport to abrogate *McGill* in whole or in part, or even cite *McGill* or use the phrase "public injunction."  Instead, *Viking River* overruled a *different* California Supreme Court decision, *Iskanian v. CLS Transp. Los Angeles, LLC* (2014) 59 Cal.4th 348 (*Iskanian*), which involved PAGA claims.  PAGA "authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the proceeds of that litigation going to the state." (*Iskanian*, at p. 360.)  In *Iskanian*, the court held that an agreement that waives representative claims under PAGA is "contrary to public policy and unenforceable as a matter of state law." (*Iskanian*, at p. 384.)  *Iskanian* also concluded the FAA did not preempt state law in that

respect, because the "FAA's goal of promoting arbitration as a means of private dispute resolution does not preclude our Legislature from deputizing employees to prosecute Labor Code violations on the state's behalf." (*Iskanian*, at p. 360.)

In *Viking River*, the United States Supreme Court characterized *Iskanian* as adopting two rules: The "principal rule prohibits waivers of 'representative' PAGA claims . . . That is, it prevents parties from waiving *representative standing* to bring PAGA claims in a judicial or arbitral forum. But *Iskanian* also adopted a secondary rule that invalidates agreements to separately arbitrate or litigate 'individual PAGA claims for Labor Code violations that an employee suffered,' on the theory that resolving victim-specific claims in separate arbitrations does not serve the deterrent purpose of PAGA." (*Viking River*, *supra*, 142 S.Ct. at pp. 1916–1917.) *Viking River* held the FAA did *not* preempt *Iskanian* to the extent the decision prohibited waiver of an employee's right to pursue a "representative" PAGA claim on behalf of the state. (*Viking River*, at pp. 1924–1925.) That is because "the FAA does not require courts to enforce contractual waivers of substantive rights and remedies." (*Viking River*, at p. 1919.)

On the other hand, *Viking River* held *Iskanian* was preempted to the extent it "invalidates agreements to arbitrate only 'individual PAGA claims for Labor Code violations that an employee suffered.' " (*Viking River*, *supra*, 142 S.Ct. at p. 1923.) *Viking River* stated the "conflict between PAGA's procedural structure and the FAA . . . derives from the statute's built-in mechanism of claim joinder," which permits broad joinder of the claims of other employees to the claim of the individual plaintiff. (*Viking River,* at pp. 1923–1924.) *Viking River* explained, "A state rule imposing an expansive rule of joinder in the arbitral context would defeat the ability of parties to

29

control which claims are subject to arbitration.  Such a rule would permit parties to superadd new claims to the proceeding, regardless of whether the agreement between them committed those claims to arbitration.  Requiring arbitration procedures to include a joinder rule of that kind compels parties to either go along with an arbitration in which the range of issues under consideration is determined by coercion rather than consent, or else forgo arbitration altogether.  Either way, the parties are coerced into giving up a right they enjoy under the FAA." (*Viking River*, at p. 1924.)

*Viking River* continued, "When made compulsory by way of *Iskanian*, the joinder rule internal to PAGA functions in exactly this way.  Under that rule, parties cannot agree to restrict the scope of an arbitration to disputes arising out of a particular ' " 'transaction' " ' or ' "common nucleus of facts." ' [Citation.]  If the parties agree to arbitrate 'individual' PAGA claims based on personally sustained violations, *Iskanian* allows the aggrieved employee to abrogate that agreement after the fact and demand either judicial proceedings or an arbitral proceeding that exceeds the scope jointly intended by the parties.  The only way for parties to agree to arbitrate *one* of an employee's PAGA claims is to also 'agree' to arbitrate *all other* PAGA claims in the same arbitral proceeding." (*Viking River*, *supra*, 142 S.Ct. at p. 1924.)

For those reasons, *Viking River* held "the FAA preempts the rule of *Iskanian* insofar as it precludes division of PAGA actions into individual and non-individual claims through an agreement to arbitrate." (*Viking River*, *supra*, 142 S.Ct. at p. 1924; see also *Lewis v. Simplified Lab. Staffing Sols., Inc.* (Dec. 5, 2022, B312871) __Cal.App.5th__ [2022 WL 17414203, pp. 4-5] [summarizing *Viking River* holding].)  The court then noted that the arbitration agreement at issue in the case contained a "severability clause" specifying that "any 'portion' of the waiver that remained valid would be

'enforced in arbitration.' " (*Viking River*, at p. 1911.) The court relied on that clause in concluding the defendant was entitled to compel arbitration of the plaintiff's individual claim, even though the arbitration agreement was invalid as to the representative claim. (*Id.* at p. 1925.)

Finally, the *Viking River* decision concluded the representative claim had to be dismissed because the plaintiff no longer had standing to assert the claim. (*Viking River, supra*, 142 S.Ct. at p. 1925.) The court reasoned, "PAGA provides no mechanism to enable a court to adjudicate nonindividual PAGA claims once an individual claim has been committed to a separate proceeding. Under PAGA's standing requirement, a plaintiff can maintain non-individual PAGA claims in an action only by virtue of also maintaining an individual claim in that action. [Citation.] When an employee's own dispute is pared away from a PAGA action, the employee is no different from a member of the general public, and PAGA does not allow such persons to maintain suit. [Citation.] As a result, [the plaintiff] lacks statutory standing to continue to maintain her non-individual claims in court, and the correct course is to dismiss her remaining claims." (*Viking River*, at p. 1925.)[18]

---

[18] Regarding this final point, Justice Sotomayor observed in a concurrence that, "if this Court's understanding of state law is wrong, California courts, in an appropriate case, will have the last word. Alternatively, if this Court's understanding is right, the California Legislature is free to modify the scope of statutory standing under PAGA within state and federal constitutional limits." (*Viking River, supra*, 142 S.Ct. at pp. 1925–1926 (conc. opn. of Sotomayor, J.).) The issue is presently pending before the California Supreme Court in *Adolph v. Uber Technologies, Inc.*, review granted July 20, 2022, S274671.

### 2. *The Reasoning of* Viking River *Does Not Apply to Plaintiffs' Request for a Public Injunction*

Defendant argues that, under *Viking River*, any claim for a public injunction under FEHA "would necessarily be distinct from the individual claim." It further argues that, under the reasoning of *Viking River*, the trial court "must enforce the agreement to arbitrate the individual claim, and must then evaluate what remains of any representative claim after subtracting the individual component. If what remains is not actionable, then [the trial court] must dismiss the purported representative claim."[19] We disagree that *Viking River* requires that approach to Plaintiffs' public injunction claim.

As explained above, the "conflict" between PAGA and the FAA "derives from the statute's built-in mechanism of claim joinder," which permits joinder of the claims of a multitude of other employees to the individual plaintiff's claims. (*Viking River*, *supra*, 142 S.Ct. at pp. 1923–1924.) A public injunction claim presents no such possibility. Whether adjudicated in a judicial forum or arbitration, a request for a public injunction is based on the evidence presented in support of the plaintiff's claims and does not require adjudication of the claims of other parties. (See *McGill*, *supra,* 2 Cal.5th at p. 957 & fn. 1 [analyzing complaint's prayer for relief and distinguishing between requests for public injunctive relief and requests for damages, all based on same general allegations].) In other words, a claim for public

---

[19] Defendant further argues that, "[a]fter the [trial court] commits [P]laintiffs' individual claims to arbitration, [P]laintiffs are indistinguishable from the general public with respect to any remaining representative claim and thus lack standing to assert it." We need not and do not consider whether Defendant's assertion regarding how the standing rules would apply in that circumstance is correct, given that we conclude *Viking River* is distinguishable. (See fn. 18, *ante*.)

injunctive relief does not allow a plaintiff "to unite a massive number of claims in a single-package suit." (*Viking River*, at p. 1924.) Accordingly, *McGill's* rule prohibiting waiver of the public injunction remedy does not require the parties to engage in arbitration "that exceeds the scope jointly intended by the parties," and it does not "unduly circumscribe[] the freedom of parties to determine 'the issues subject to arbitration' and 'the rules by which they will arbitrate' . . . in a way that violates the fundamental principle that 'arbitration is a matter of consent.' " (*Viking River*, at pp. 1923–1924.)

Further, while a PAGA claim can be divided into an " 'individual' " portion involving "claims based on code violations suffered by the plaintiff," and a " 'representative' " portion "arising out of events involving other employees" (*Viking River*, *supra*, 142 S.Ct. at p. 1916), the same is not true of a claim for public injunctive relief. A public injunction is sought by an aggrieved person in an action filed "on his or her own behalf, not 'on behalf of the general public,' " even though the " 'the primary purpose and effect of' " the relief is " 'to prohibit and enjoin conduct that is injurious to the general public.' " (*McGill*, *supra*, 2 Cal.5th at p. 959; see also *id*. at pp. 959–960 [stating that a request for a public injunction "does not constitute the 'pursu[it]' of 'representative claims or relief on behalf of others' " within meaning of a ballot proposition].) A public injunction is a unitary remedy that cannot be divided into "individual" and "representative" components.

In contrasting an action seeking a public injunction with a class action, *McGill* emphasized that a public injunction is a "*substantive statutory remedy*" rather than a " '*procedural* device.' " (*McGill*, *supra*, 2 Cal.5th at p. 965.) Like a class action, PAGA is procedural. PAGA "does not create property rights or any other substantive rights. . . . It is simply a procedural

statute allowing an aggrieved employee to recover civil penalties . . . that otherwise would be sought by state labor law enforcement agencies." (*Amalgamated Transit Union, Loc. 1756, AFL-CIO v. Superior Ct.* (2009) 46 Cal.4th 993, 1003; see also *Viking River*, *supra*, 142 S.Ct. at p. 1919 [quoting that language in *Amalgamated Transit*].)  Tellingly, in characterizing the problem with PAGA, *Viking River* emphasized that its "*procedural* structure" "[r]equir[es] arbitration *procedures* to include [an expansive] joinder rule." (*Viking River*, at pp. 1923–1924, italics added.)

Preemption of a rule prohibiting waiver of the right to seek a public injunction would *directly* contradict the proposition that "the FAA does not require courts to enforce contractual waivers of substantive rights and remedies." (*Viking River*, *supra*, 142 S.Ct. at p. 1919.)  That is the principle underlying *McGill's* conclusion "that the FAA does not require enforcement of a provision in a predispute arbitration agreement that, in violation of generally applicable California contract law, waives the right to seek *in any forum* public injunctive relief. . ." (*McGill*, *supra*, 2 Cal.5th at p. 963.)  *Viking River* does not require a different result.  (See also *MacClelland v. Cellco P'ship* (N.D.Cal., July 1, 2022, No. 21-cv-08592-EMC) ___ F.Supp.3d ___ [2022 WL 2390997, p. 9] [rejecting preemption argument with respect to claim for public injunctive relief and stating, "*Viking River* focused on a procedural mechanism particular to" PAGA].)[20]

---

[20] Defendant cites no portion of the record showing the Arbitration Provision contains a severability clause, providing an independent reason for affirming the trial court's ruling regarding the public injunction claim.  As noted previously, the existence of such a clause was necessary to *Viking River's* conclusion that the valid portion of the arbitration agreement in that case, relating to the individual PAGA claim, was enforceable. (*Viking River*, *supra*, 142 S.Ct. at pp. 1911, 1925.)  In the present case, even if it were

# DISPOSITION

The trial court's order is affirmed. Costs on appeal are awarded to Plaintiffs.

_____

SIMONS, Acting P.J.

We concur.

_____

BURNS, J.

_____

WISEMAN, J.*

(A164053)

_____

possible to divide a request for a public injunction into individual and representative components, and even if Defendant were correct that _Viking River's_ reasoning with respect to PAGA also applies to a public injunction claim, the Arbitration Provision would still be invalid as to the "representative" component. Under _Viking River_, without a severability clause, the provision would be unenforceable as to the entirety of the claim.

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## Vaughn et al. v. Tesla, Inc. (A164053)

Trial Judge:       Hon. Evelio M. Grillo

Trial Court:       Alameda County Superior Court

Attorneys:

      Holland & Knight LLP, Sara A. Begley, Christina T. Tellado; Reed Smith LLP, Raymond A. Cardozo, Tyree P. Jones, Brian A. Sutherland for Defendant and Appellant.

      Bryan Schwartz Law, Bryan Schwartz; California Civil Rights Law Group, Larry Organ; Altshuler Berzon LLP, Michael Rubin, Corinne Johnson, Jonathan Rosenthal for Plaintiffs and Respondents.